UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JEAN A. FOLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:14-cv-01256-DKL-RLY |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ENTRY REVIEWING COMMISSIONER'S DECISION**

Jean A. Foley seeks judicial review under 42 U.S.C. § 405(g) of the decision of the Acting Commissioner of Social Security denying Foley disability insurance benefits under Title II of the Social Security Act. The parties have consented to have the undersigned conduct all proceedings in this case. Foley contends that the ALJ failed to properly weigh the medical evidence, erred in evaluating her credibility, and relied on flawed testimony from the vocational expert. Having considered the administrative record and the parties' arguments, the Court decides as follows.

I.   BACKGROUND

   A.  Procedure

Foley applied for a period of disability and disability insurance benefits, alleging that she became disabled on June 1, 2006, because of degenerative disc disease, headache

impairment, anxiety, and depression. Her application was denied initially and on reconsideration. A hearing was held before an administrative law judge ("ALJ") in January 2014; Foley, represented by counsel, testified, as did a vocational expert ("VE"), by telephone. Although the ALJ found that Foley suffered from severe impairments, the ALJ found that through her date last insured, December 31, 2011, Foley retained the capacity to work. Foley sought review by the Appeals Counsel, which denied review.

### B. Evidence

A 2006 MRI of Foley's left shoulder revealed marked degenerative changes involving the acromioclavicular joint (the joint at the top of the shoulder), mild supraspinatus tendinitis/tendinopathy (a painful inflammatory condition on the supraspinatus muscle located in the shoulder area), and a small osseous cyst (a cyst-like lesion on the bone). (R. 359.) An MRI in 2008 of Foley's cervical spine showed a mild disc bulge and small protrusion at C3-4 and mild disc bulging at C4-5 through C6-7 with no impingement or stenosis. (R. 564-65; *see also* R. 529-30.) A November 2011 MRI of her lumbar spine showed broad disc bulges at L3-4 and L4-5; bilateral foraminal narrowing (reduction in the space available for nerve roots) at L4-5 (clinical correlation was recommended for associated radiculopathies), and straightened lumbar lordosis (straightening of the normal curvature of the lower spine) suggesting muscle spasm. (R. 701.) A June 2012 MRI of the cervical spine showed mild spondylosis (cervical osteoarthritis of the joints); slight reversal of the normal cervical spine curvature that could be related to spondylosis, muscle spasm, or patient position; mild posterior disc

bulges; bilateral uncovertebral degenerative joint disease at C4-5; and mild bilateral foraminal compromise. (R. 702.)

From November 2004 to June 2006, Foley was treated by an osteopathic physician for myofascial pain syndrome (a chronic pain disorder) involving her thoracic spine. She was diagnosed with pain in the thoracic spine, myofascial pain syndrome, and occipital neuralgia (inflammation of the nerves that run from the top of the spinal cord through the scalp). (R. 373.) Foley received trigger point injections, to which she responded very well. However, she returned to work and her myofascial pain syndrome became worse with muscle spasms. She was prescribed medications and received multiple treatments, most of which had no lasting results once she returned to work as a home health aide. (R. 417.) She also experienced increasing symptoms of depression. (R. 386.)

In September 2006, Foley was admitted to the hospital for a few days following an attempted suicide by drug overdose. She was discharged with a diagnosis of depressive disorder and opiate abuse versus dependency. (R. 392.)

In April 2008, Foley was seen by David VanDercar, M.D., Ph.D., PA, at the Tampa Pain Clinic for low back pain and shoulder pain. She said that she had been receiving some pain medication from another physician but it was not adequate to control her pain. (R. 749.) Dr. VanDercar prescribed Oxycontin, Oxycodone, Methadone, Celexa, Fioricet, and Valium. (*Id.*) She was again seen at monthly follow-up appointments in May and June 2008. She discontinued treatment at the Pain Clinic because the clinic did not accept her insurance.

In July 2009, Foley was examined by Alejandro Tapia, M.D., at the Brandon Pain Clinic and diagnosed with chronic neck pain with radicular symptoms to the shoulders, left greater than right; multilevel cervical facet arthrosis (joint cartilage deterioration); disc bulging with foraminal narrowing at C3-4 through C6-7, left greater than right; cervicogenic headaches (pain perceived in the head from a source in the neck); chronic distal thoracic back pain; thoracic facet arthrosis; disc bulges at T1-2 and T2-3; left shoulder marked degenerative changes AC (acromioclavicular) joint with supraspinatus tendinitis/tendinopathy; myofascial pain syndrome and hepatitis C.  (R. 415.)  He administered a cervical facet steroid injection and prescribed Midrin for headaches, Soma and Oxycodone for pain among other medications.  (R. 414.)  Foley was provided some relief for two weeks.  (R. 411.)  In August 2009, on examination, Foley was positive for tenderness to palpitation in the cervical and thoracic spine.  (R. 412.)  She had cervical, and thoracic pain with flexion and extension and rotation.  Her cervical and thoracic range of motion was decreased, and she was positive for cervical facet maneuvers.  (*Id.*)

In February 2010, Foley was evaluated again by Dr. VanDercar at the Tampa Pain Clinic for cervicalgia, low back pain, and left shoulder pain.  Treatment notes indicate that she had mild disc bulges in her C3-4 and C4-5 through C6-7 with flattening of the thecal sac.  She also had osseous degenerative changes.  He prescribed Oxycontin, Oxycodone, and Zanaflex.  (R. 439.)  She was seen for monthly evaluations.  Foley reported that the intensity of the pain was improving.  (See R. 440 (in February 2010 rating pain on a scale of 0 to 10 as a 9 at worst, 7 on average, and 5 at best); R. 461 (in June 2010 rating pain as a 7 at worst, 4 on average, and 5 at best), R. 466 (in August 2010 rating pain

as an 8 at worst, 5 on average.))  In October 2010, Foley wrote that although headaches were more frequent, her "back [was] better than ever!"  (R. 485.)

In May and June 2010, Dr. VanDercar noted that "[p]ain medication has improved this patient's ability to function on a day to day basis."  (R. 451, 453, 455.)  In October 2010, his notes indicated that "[p]atient's pain is sufficiently well-controlled that we do not need to make any changes to [her] pain medication" and that her medications "are currently providing sufficient relief to allow patient to function on a day to day basis with an almost normal quality of life."  (R. 467.)  Foley reported that her pain intensity had decreased with pain medication and that her ability to work, participate in sports, hobbies, and social activities, perform home activities, sleep, sit, and stand improved with pain medications.  (R. 472.)  According to Foley's own report, "she can work full-time but cannot do as good of a job as she could if she was not in pain."  (*Id.*)  Her pain limited her participation in "moderately energetic activities."  (*Id.*)  She reported that with pain medication she could sit for three to four hours with frequent breaks to change positions, stand for 30 minutes, and lift her arms to her shoulders for short periods of time.  (*Id.*)  Foley stated that her pain continued to be debilitating, but she was able to take care of herself and her husband's needs.  (R. 476.)  According to Foley, with pain medication, she was able to work full-time, but couldn't do as good a job as she would otherwise, due to pain.  (*Id.* at 481.)

One month later, in November 2010, Dr. VanDercar again noted that Foley's "medications are currently providing sufficient relief to allow [her] to function on a day to day basis with an almost normal quality of life."  (R. 484.)  He made the same

5

observation from Foley's monthly office visits in December 2010, and again in February, March, April, May, June, and October 2011.  (R. 484, 487, 495, 498, 501, 504, 507, 522)  And in July 2011, Dr. VanDercar wrote that "patient's pain is well controlled by [her] current medication regime."  (R. 511.)  Furthermore, beginning in August 2011, Foley's pain was "well enough controlled" and her medications stable enough that Dr. VanDercar felt comfortable seeing her on a less frequent basis—once every three months.  (R. 514.)

In December 2011, Dr. Robert Oliva, M.D., conducted a consultative examination for the Social Security Administration.  On examination, Foley had decreased range of motion in the lumbar spine and left shoulder, but her gait and muscle strength were normal and she had no neurological deficits.  (R. 556, 559.)  Dr. Oliva diagnosed depression, neck/back pain, and stomach problems/digestive problems/colitis.  (R. 557.)

Also in December 2011, state agency reviewing psychologist Jessica Anderson, Psy. D., opined that Foley had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and one or two episodes of decompensation.  (R. 89.)  With regard to social interaction limitations, Dr. Anderson found that Foley was moderately limited in interacting appropriately with the general public, but not significantly limited in her ability to interact with coworkers and supervisors.  (R. 92.)  Dr. Anderson also found that Foley was able to carry out simple and detailed instructions and required normal levels of supervision. (R. 91.)  Dr. Anderson opined that Foley could understand, remember and carry out simple and detailed instructions; make simple decisions; attend and concentrate for 2 hours at a time; interact adequately with

coworkers and supervisors; and respond appropriates to changes in a routine work setting. (R. 92.) She concluded that despite her limitations, Foley could meet the basic mental demands of competitive work on a sustained basis. (*Id.*) Another psychologist, Timothy Foster, Ph.D., who conducted a consultative mental status exam of Foley in December 2011 agreed that she had moderate social limits. (R. 541.)

In January 2012, Dr. VanDercar completed a multiple impairment questionnaire, diagnosing cervicalgia, low back pain, shoulder pain, cervical facet joint syndrome, cervical disc displacement and myelopathy (compression of the spinal cord). He stated that his diagnoses were supported by clinical findings on physical exam of tension and sensitivity in her neck and back, self-reporting and pain scores, observations of Foley on a monthly basis for over four and one-half years, and a cervical MRI. (R. 564-65.) He estimated her level of pain as 7 on a scale of 0 to 10. (R. 566.) Dr. VanDercar opined that in an 8-hour day, Foley could sit for 3 hours, and stand/walk for 4 hours. (R. 566.) He indicated that she could not sit continuously and that every hour she would need to get up and move around for 3 to 5 minutes before sitting again. (R. 566-67.) He opined that she would be absent from work as a result of her impairments or treatment about 2 to 3 times a month. (R. 570.)

At the hearing, Foley testified that she was unable to work because of pain in her back, shoulder, and headaches. She has depression and cries and worries all the time. She does some housework, taking breaks as needed; and she helps her husband care for his needs. She testified that her pain has gotten worse since she moved back from Florida.

The VE testified that a hypothetical individual with Foley's age, education, and work history who could perform work at the medium exertional level but never climb ladders or scaffolds or balance, who was limited to only occasional kneeling, crouching and crawling, who should never be around unprotected heights or moving mechanical parts, who would be limited to simple, routine tasks and simple work-related decisions, and should never have any contact with the public could not perform Foley's past work; however, such an individual could work as a stocker, cleaner, and assembler. (R. 74-76.)

On February 11, 2014, the ALJ issued a decision denying Foley's request for benefits, concluding that she was not disabled through December 31, 2011, the last date insured. Applying the Social Security Administration's five-step analysis for disability claims, see 20 C.F.R. §§ 404.1520(a)(4), the ALJ found at steps one and two that Foley had not engaged in "substantial gainful activity" during the period from her alleged onset date until her date last insured and that she suffered from the "severe" impairments of degenerative disc disease and depression. The ALJ also found that Foley had other impairments—irritable bowel syndrome/colitis and headaches—that were not severe. At step three, the ALJ concluded that Foley's impairments did not meet or equal the severity of any impairment listed in the regulations. So she proceeded to assess Foley's residual functional capacity.

The ALJ determined that Foley had the capacity to perform medium work with no more than occasional overhead work with the left upper extremity and no more than occasional kneeling, crouching and crawling. The ALJ also found that the work "shall require no climbing of ladders and scaffolds, no balancing and no exposure to

unprotected heights and moving mechanical parts" and "must be limited to simple, routine tasks, simple work related decision and no contact with the public." (R. 19.)

In making this RFC finding, the ALJ found that Foley's statements as to the intensity, persistence and limiting effects of her symptoms were not entirely credible. The ALJ reasoned that the objective findings (other than regarding the left shoulder) did not support the conclusion that any of Foley's conditions were severely limiting "much less totally disabling" and that the clinical findings did not support a finding of total disability. (R. 21.) The ALJ also explained that Foley had relatively normal activities of daily living, she had assisted her disabled husband with daily tasks, and there was evidence that she returned to Indiana to help care for her elderly parents. (R. 21-22.) In addition, the ALJ noted that there was an almost three-year gap in any documented treatment from September 2006 until August 2009, that Foley's treatment was "little more than monthly visits to renew her prescriptions," that her medications were "relatively effective" in controlling her symptoms, that in 2011 Dr. VanDercar thought Foley was doing well enough on her medications that he only needed to see her every 3 months, and that she had "not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 21, 23.) Finally, the ALJ relied on consultative examiner Dr. Oliva's physical examination, which she described as "quite unremarkable." (R. 22.)

At step four, the ALJ found that given Foley's limitations, she was unable to perform her past relevant work. Based on the VE's testimony, the ALJ determined at step

9

five that there were significant numbers of jobs other jobs in the national economy that Foley could perform. Therefore, the ALJ concluded that Foley was not disabled.

## II.     DISCUSSION

The Social Security Act provides for the payment of benefits to persons who have contributed to the program and suffer from a physical or mental disability (DIB). "Disability" is defined as the "inability to engage in any substantial gainful activity [because] of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last … not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Court's review of the ALJ's decision denying benefits is "extremely limited." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). The ALJ's decision will be upheld so long as it applies the correct legal standards and is supported by substantial evidence. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (quoting *Elder*, 529 F.3d at 413). The Court may not reconsider facts or evidence or make its own credibility determinations. Even if reasonable minds could disagree as to whether the plaintiff is disabled, the ALJ's decision denying benefits must be affirmed if it is adequately supported. *Id.* An ALJ need not specifically address every piece of evidence, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008), but "must adequately discuss the issues and must build an 'accurate and logical bridge from the evidence to [her] conclusion.'"

*Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

Foley first complains that the ALJ gave "little or no weight" to the opinions of treating pain management specialist Dr. VanDercar. Foley submits that his opinions should have been given controlling weight. A treating physician's medical opinion as to the nature and severity of an impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical techniques and not inconsistent with other substantial evidence in the record. *Stepp*, 795 F.3d at 719; 20 C.F.R. § 404.1527(c)(2). If an ALJ does not give a treating physician's opinion controlling weight, the ALJ can still consider it. How much weight to give the opinion depends on several factors, including the length, nature, and extent of the physician's treatment relationship; the frequency of examinations; whether the opinion is supported by medical signs and findings; whether the opinion is consistent with the record as a whole; and whether the opinion is about medical issues related to the physician's area of specialty. *Elder*, 529 F.3d at 415; 20 C.F.R. § 404.1527(d). A court will "uphold 'all but the most patently erroneous reasons for discounting a treating physician's assessment.'" *Stepp*, 795 F.3d at 718 (quoting *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010)).

The ALJ explained her reasons for not giving Dr. VanDercar's opinion controlling weight: it was "not consistent with his own treatment observations the claimant was improving" and "his treatment modality [prescription pain medications] … does not suggest a condition as limited as his medical source statement." The first was a proper reason for discounting Dr. Van Dercar's opinion. *See Skarbek v. Barnhart*, 390 F.3d 500, 503

11

(7th Cir. 2004) (stating that "[a]n ALJ may discount a treating physician's medical opinion … when [it] is internally inconsistent"). And his treatment records indicate that Foley was improving; in fact, in 2011 he decided she was doing so well that he only needed to see her every 3 months instead of monthly. As for the second reason, the ALJ implied that Dr. VaDercar's treatment was relatively conservative. Courts will not question an ALJ's determination that treatment was "relatively conservative." *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009). Dr. VanDercar's opinions were supported by clinical findings on examination of tension and sensitivity in Foley's neck and back, his treatment and observations of Foley for over four years, and findings from two MRIs of her cervical spine. However, that supportability does not require that the opinions be given controlling weight. As noted, a treating physician's medical opinion is entitled to controlling weight if it is *both* well-supported by medically acceptable clinical techniques *and* not inconsistent with other substantial evidence in the record. *See, e.g.*, *Stepp*, 795 F.3d at 719. The ALJ found Dr. VanDercar's opinions inconsistent with other substantial evidence.

Foley argues that her "modest response" to "substantial" and "heavy" narcotic pain medications, fails to contradict Dr. VanDercar's opinions. As the physician's notes reflect, such medications provided her pain relief. For example, in October 2010, Dr. VanDercar's notes indicated that "[p]atient's pain is sufficiently well-controlled that we do not need to make any changes to [her] pain medication" and her medications "are currently providing sufficient relief to allow patient to function on a day to day basis with an almost normal quality of life." (R. 467.) Foley reported that her pain intensity had

12

decreased with pain medication and that her ability to work; participate in sports, hobbies, and social activities; perform home activities; sleep, sit, and stand improved with pain medications. (R. 472.) At that time, according to Foley's own report, "she [could] work full-time but cannot do as good of a job as she could if she was not in pain." (R. 472.) One month later, Dr. VanDercar again noted that Foley's "medications are currently providing sufficient relief to allow [her] to function on a day to day basis with an almost normal quality of life." (R. 484.)

 Next, Foley challenges the ALJ's reliance on the opinion of non-examining physician Gloria Hankins, M.D., arguing that the opinion of a "non-examining physician with unknown credentials who reviewed a deficient record cannot overcome the well-supported opinions from a treating specialty." Though the record does not disclose Dr. Hankins's specialty, if any, it does reflect that she is a medical doctor. Although Dr. Hankins referred to the 2008 MRI and did not refer to the later MRI in 2011, both MRIs showed only mild changes. Foley incorrectly contends that the 2008 MRI was performed prior to the relevant period at issue; she claimed disability beginning in June 2006. Anyway, to support her findings as to Foley's RFC, Dr. Hankins also relied on the report of the consulting examiner from December 2011, which was during the time period for which Foley was insured. Foley also complains that Dr. Hankins reviewed the file in January 2012, more than two years before the ALJ's decision. However, Dr. Hankins reviewed the file only one month after Foley's date last insured and therefore close to the relevant time period.

Furthermore, the ALJ provided good reasons for giving "the most probative weight" to Dr. Hankins's assessment as it was "generally the most consistent with the objective and clinical findings documented in the … medical evidence." (R. 23.) Dr. Hankins's assessment was consistent with the consultative examination performed by Dr. Oliva in December 2011, which the ALJ noted was "quite unremarkable" (R. 22); aside from slightly reduced range of motion, Foley's lumbar spine and left shoulder showed no apparent limitations.

Foley argues that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In this case, however, the ALJ did not discount Dr. VanDercar's opinion solely on the basis of a contradictory opinion of a non-examining physician. Rather, the ALJ gave sufficient reasons, supported by substantial evidence in the record, for declining to give Dr. VanDercar's opinion controlling weight.

Foley contends that even if the ALJ did not err in failing to give Dr. VanDercar's opinions controlling weight, she erred in determining what weight to give them. Foley asserts that the ALJ failed to consider any of the relevant factors provided in 20 C.F.R. § 404.1527. The factors listed in the regulation are examining relationship; treatment relationship; the length of the treatment relationship and frequency of examination; nature and extent of treatment relationship; supportability; consistency with the record as a whole; whether specialization; and other factors that support or contradict the opinion. *Id.* § 404.1527(c). The ALJ's decision demonstrates that she considered the

14

examining and treatment relationship; and the nature and extent of the treatment relationship; Dr. VanDercar's observations and treatment modality, which was limited to prescription pain medication, and the inconsistency not only with Dr. VanDercar's own observations that Foley was improving but also with record as a whole. (See R. 21 (discussing Foley's "regular treatment with pain specialist, Dr. VanDercar" to simply renew prescriptions); *id.* at 22 (noting Foley's "quite unremarkable" physical examination with the consultative examiner in December 2011 and state agency reviewing physicians' assessment of Foley's condition); *id.* at 23 (observing that Foley's medications "have been relatively effective in controlling" her symptoms; that generally she did not receive the type of treatment one would expect for a totally disabled person; that her treatment visits were to refill her pain medications, no physical therapy was documented, and no surgery was suggested); *id.* at 24 (referring to Foley's records at the Tampa Pain Clinic from September 2008 through September 2011 and the impairment questionnaire Dr. VanDercar completed on January 12, 2012)). The ALJ considered the appropriate factors and minimally articulated her reasons for discounting Dr. VanDercar's opinion; thus, the Court allows her weighing of the medical opinions to stand. *See Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012).

Turning to the credibility finding, a court "will overturn an ALJ's credibility determination only if it is 'patently wrong.'" *Stepp*, 795 F.3d at 720 (quoting *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012)*).* When an ALJ finds a medical impairment that could reasonably be expected to produce pain or other symptoms, then she must assess how the claimant's symptoms to determine how they affect the claimant's

15

functioning. SSR 96-7p. An ALJ should consider factors including the objective medical evidence, the claimant's daily activities, allegations of pain, the effectiveness of medication, and the types of treatment for pain or other symptoms. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); 20 C.F.R. § 404.1529(c)(3).

The ALJ gave specific reasons supported in the evidence for her adverse credibility determination. For example, the objective medical evidence (other than that concerning Foley's left shoulder), including Foley's physical examination with the consultative examiner did not support a claim of total disability. In addition, the evidence showed that her pain medications were relatively effective in controlling her symptoms, and Foley assisted her disabled husband with his daily tasks. Foley argues that there is no evidence that she engaged in any significant physical exertional activities caring for her husband. To the contrary, however, she testified that she helped her husband get up out of bed, and helped him shower and take care of his hygiene needs. (R. 62-63.) Foley also argues that the ALJ cited no evidence to support the conclusion that Foley's medications were relatively effective in controlling her symptoms. But that is incorrect: the ALJ cited to Dr. VanDercar's treatment notes, and the notes support the ALJ's conclusion.

That the ALJ gave a flawed reason for her credibility finding does not necessarily mean that the credibility determination was patently wrong. *See Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (concluding that an ALJ's error in making a credibility determination does not require reversal if the ALJ otherwise justifies her credibility finding); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("[T]he ALJ erred in finding that there were 'gaps' in [the claimant's] pursuit of treatment. That error does not

16

necessarily mean the ALJ's credibility determination was patently wrong."). The error in drawing adverse inferences from the gap in treatment without considering any explanation for the gap does not require reversal; the credibility finding was otherwise sufficiently justified and was not patently wrong.

Turning to the VE's testimony, Foley argues that the ALJ's reliance on that testimony was erroneous because the RFC finding was not supported by substantial evidence. More specifically, she asserts that the ALJ failed to properly weigh the medical evidence and evaluate her credibility. However, as explained, the ALJ did properly weigh the medical evidence and did not err in finding that Foley was not entirely credible.

Foley also argues that the ALJ's hypothetical question to the VE did not account for all of Foley's mental limitations. Generally, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (stating that an ALJ's hypothetical question to a VE "must include all limitations supported by medical evidence in the record. … [T]he question must account for documented limitations of 'concentration, persistence or pace.'") (citations omitted). As Foley notes, the ALJ found that she has moderate difficulties in social functioning and moderate difficulties in concentration, persistence,

or pace. Yet, Foley argues that the ALJ did not include any such restrictions or otherwise describe these limitations in her hypothetical to the VE.

"[T]he Seventh Circuit has not held that a limit of simple, repetitive work can never account for moderate CPP [concentration, persistence, and pace] limitations; rather, an ALJ is merely not to assume that such a limit will automatically account for such limitations." *Dehart v. Colvin*, No. 4:12-cv-137-WGH-TWP, 2013 WL 6440504, at *3 (S.D. Ind. Dec. 9, 2013) (concluding ALJ did not err where he mentioned to the VE the claimant's limitation to simple, repetitive tasks and her concentration, persistence, and pace limitations). Here, the ALJ restricted Foley "to simple and repetitive tasks with simple work related decision and no contact with the public." (R. 22.) In doing so, the ALJ accounted for Foley's no more than "mild to moderate limitation in concentration, persistence and pace," which limitation was based on Foley's subjective allegation of lapses in concentration and memory. (R. 19.) The ALJ explained that given "the relatively weak evidence, this is clearly an adequate accommodation of a rather mild mental condition." (R. 19.) This distinguishes cases where the claimant's limitations in concentration, persistence and pace were significant. *See, e.g., O'Connor-Spinner*, 627 F.3d at 620 (state agency psychologist determined that there were at least moderate limitations in concentration, persistence and pace); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003) (claimant had frequent deficiencies in concentration, persistence and pace). The ALJ intended the restrictions to simple repetitive tasks and simple work-related decisions to account for Foley's mild to moderate limitations in concentration, persistence and pace.

The ALJ's hypothetical to the VE limited the individual "to performing simple, routine tasks" and "simple work-related decisions," (R. 75), thus incorporating the limitations.

Finally, Foley contends that the ALJ's restriction to "no contact with the public" failed to account for her moderate restriction in social functioning because such functioning also involves interactions with coworkers and supervisors. Although the ALJ found that Foley had "no more than moderate social limitations" (R. 18), she cited the opinion of state agency reviewing psychologist Dr. Anderson. (R. 22 (citing Ex 2A).) Dr. Anderson found that Foley's social functioning was "mildly to (barely) moderately limited." (R. 90.) Moreover, Dr. Anderson translated her findings into an RFC assessment, concluding that Foley was "moderately limited" in her ability to interact appropriately with the general public, "but not significantly limited" in her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers, and to maintain socially appropriate behavior. (R. 92.) And she explained that Foley "can interact adequately with co-workers and supervisors and respond appropriately to changes in a routine work setting." (*Id.*) Thus, Dr. Anderson's assessment of Foley's social functioning did not include any limitation on her ability to interact with co-workers or supervisors. The ALJ reasonably relied on Dr. Anderson's RFC assessment in restricting Foley's social interaction only to "no contact with the general public." In doing so, the ALJ accounted for Foley's moderate limitation in social functioning as supported by the medical record.

### III.   CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

Entered this date:  09/21/2015

*Denise K. LaRue*

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Electronic distribution: to counsel of record